**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| GAREGIN TATOSYAN, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 1:26-cv-10223-JEK |
| MARY QUEEN GALSTIAN, | ) ) ) | |
| Respondent. | ) ) | |

**<u>MEMORANDUM AND ORDER ON RESPONDENT'S MOTION TO DISMISS</u>**

**KOBICK, J.**

This is a case under the Hague Convention on the Civil Aspects of International Child Abduction ("Convention") seeking the return of a child, E.T., to Armenia, her country of birth. Petitioner Garegin Tatosyan asserts that his ex-wife, respondent Mary Queen Galstian, wrongfully removed E.T. from Armenia and retained her in the United States when Galstian traveled to this country with their child in February 2025. Galstian, proceeding *pro se*, has moved to dismiss Tatosyan's petition, contending that he fails to state a claim under the Convention because the United States is E.T.'s country of habitual residence and she has not breached any custody rights Tatosyan possesses under Armenian law. Concluding that these arguments do not warrant dismissal of Tatosyan's claim under the Convention, the Court will deny Galstian's motion to dismiss and proceed to an evidentiary hearing on the disputed matters in this case.

**BACKGROUND**

I.      **<u>Statutory Framework.</u>**

The Hague Convention was adopted in 1980 "'[t]o address the problem of international child abductions during domestic disputes.'" *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (quoting

*Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014)).[1] The Convention "aims to deter parents from abducting their children to a country whose courts might side with them in a custody battle." *Díaz-Alarcón v. Flández-Marcel*, 944 F.3d 303, 305 (1st Cir. 2019). Its animating "principle is that the courts of a child's country of habitual residence . . . [should] be the entities to make custody determinations in the child's best interest." *Mendez v. May*, 778 F.3d 337, 343 (1st Cir. 2015).

The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, implements the United States' obligations under the Convention. *Id.* The statute allows a parent to petition a federal or state court to return an abducted child to the child's country of habitual residence. 22 U.S.C. §§ 9003(a)-(b). The court is tasked with determining only "'whether a custody decision should be made in the United States or in the country of the child's habitual residence,'" *Rodrigues v. Silveira*, 141 F.4th 355, 358 (1st Cir. 2025) (quoting *Avendano v. Balza*, 985 F.3d 8, 11 (1st Cir. 2021)), not the merits of the underlying child custody claims, 22 U.S.C. § 9001(b)(4). "[I]t is the job of the courts of [the child's habitual residence], not the district court, to make the appropriate custodial and family law determinations." *da Silva v. de Aredes*, 953 F.3d 67, 77 (1st Cir. 2020) (quotation marks omitted). Accordingly, "an order of return pursuant to the Hague Convention is not a final determination of custody rights." *Neergaard-Colon v. Neergaard*, 752 F.3d 526, 530 (1st Cir. 2014).

## II.    <u>Factual Background.</u>

The following facts, which are assumed true on a motion to dismiss, are drawn from the verified complaint, documents fairly incorporated by reference in that pleading, and documents

---

[1] The United States and Armenia are among the list of Hague Convention signatories, and the Convention applies to the countries' bilateral relationship. Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table, https://perma.cc/B7NL-AWNQ.

subject to judicial notice. The parties agree that the Court may take judicial notice of the pre-removal, translated decisions of the Armenian courts attached to their filings in support of and in opposition to the motion to dismiss.

Garegin Tatosyan is a citizen of Armenia. ECF 1, ¶ 1. Mary Queen Galstian is a citizen of the United States who moved to Armenia in November 2022. *Id.* ¶ 6. On January 16, 2024, Tatosyan and Galstian married in Armenia. *Id.* ¶ 7. Their child, E.T., was born in Armenia in February 2024. *Id.* ¶ 8. By virtue of her birth and parentage, E.T. is a citizen of both Armenia and the United States. *Id.* ¶ 9. From her birth and until her removal in February 2025, E.T. resided in Armenia. *Id.* ¶ 8.

Tatosyan and Galstian divorced on November 14, 2024. *Id.* ¶ 7. Following their separation, Tatosyan was unable to see E.T. *Id.* ¶ 15. On October 28, 2024, Tatosyan initiated proceedings in the Civil Court of First Instance of the Republic of Armenia ("Civil Court") to establish a parenting schedule. *Id.* ¶ 16. The Civil Court issued an interim order on November 5, 2024, granting Tatosyan four hours of visitation time each week in Galstian's presence and prohibiting Galstian from removing E.T. from Armenia without his consent. *Id.*; ECF 1-6, at 7. On December 5, 2024, Galstian filed a motion demanding security for possible damages because the travel restriction could lead her to lose her job. ECF 1-7, at 16-17; ECF 16-2, at 3. The Civil Court rejected her claim on December 26, 2024, and she appealed to the Civil Court of Appeal of the Republic of Armenia ("Court of Appeal"). ECF 1, ¶ 18; ECF 1-7, at 2; ECF 16-2, at 3.

On January 29, 2025, the Court of Appeal issued a decision annulling the Civil Court's December 26, 2024 order and requiring Tatosyan to transfer 4,000,000 Armenian drams to the court for possible damages to Galstian. ECF 1-7, at 19. The Court of Appeal concluded that E.T. lived with Galstian and was breastfed by Galstian, who took responsibility for "the full care of"

E.T. and who bore "all the expenses necessary for the child's livelihood." *Id.* at 3-4. Galstian, the "sole breadwinner," worked remotely for a company that operated in the United States. *Id.* at 4-5. Her company required that she travel to the United States each year for an in-person performance review. *Id.* at 5. If Galstian could not travel to the United States for that annual evaluation, the Court of Appeal explained, she "may lose her job." *Id.* at 4. The Court of Appeal determined that it was "extremely important and . . . in the best interest of" E.T. for Galstian to be able to travel to the United States, so that the child could continue to be breastfed and so that Galstian would "be able to provide stable financial resources for the child and herself." *Id.* at 4-5, 13, 17.

Tatosyan did not transfer the security amount ordered by the Court of Appeal. ECF 16-2, at 3. As a result, on February 6, 2025, the Civil Court partially annulled the November 5, 2024 interim order and lifted the travel restriction, thus permitting Galstian to travel outside Armenia with E.T. without Tatosyan's consent. *Id.* at 4-5. Less than a week later, on February 12, 2025, Galstian traveled to the United States with E.T. ECF 1, ¶¶ 22-23; ECF 1-8, at 2. Tatosyan did not see or communicate with E.T. from that date until at least January 2026. ECF 1, ¶ 26.

In September 2025, Tatosyan filed an application with the Central Authority of Armenia pursuant to the Hague Convention. *Id.* ¶ 27; ECF 1-9, at 6. On January 20, 2026, he initiated this action, alleging wrongful removal and retention in violation of the Hague Convention and requesting that E.T. be returned to Armenia. ECF 1, ¶¶ 30-35. In response, Galstian moved to dismiss the petition for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF 10. After receiving the opposition brief from Tatosyan and a reply from Galstian, the Court held a hearing on the motion and took it under advisement. ECF 16, 17, 30. The Court also granted the parties leave to file supplemental briefs concerning Armenian law, and each party submitted a supplemental filing. ECF 34, 35.

**STANDARD OF REVIEW**

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

**DISCUSSION**

The Hague Convention states that "[w]here a child has been wrongfully removed or retained . . . the authority concerned shall order the return of the child forthwith." Hague Convention, art. 12. The removal or retention of a child is "wrongful" where "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention" and, "at the time of removal or retention[,] those rights were actually exercised . . . or would have been so exercised but for the removal or retention." *Id.*, art. 3. To prevail on a petition under the Convention, "the party seeking relief must establish by a preponderance of the evidence that the abductor wrongfully removed or retained [the child] within the meaning" of the Convention. *Rodrigues*, 141 F.4th at 358 (quotation marks omitted). The petitioner must show that he "(1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights." *Mendez*, 778 F.3d at 343. If the three elements are met, the

5

Convention's "strong presumption in favor of returning [the] wrongfully removed or retained child applies." *Rodrigues*, 141 F.4th at 358 (quotation marks omitted). The respondent may counter the presumption of return by establishing the application of one or more exceptions or defenses. 22 U.S.C. § 9003(e)(2).

Galstian argues that Tatosyan fails to plausibly state a Hague Convention claim. At this stage in the case, she disputes only the first two elements of Tatosyan's prima facie case—(1) that Armenia was E.T.'s country of habitual residence, and (2) that her removal of E.T. from Armenia and retention of the child in the United States breached custody rights Tatosyan had prior to E.T.'s removal. She also contends that returning E.T. to Armenia would pose a grave risk to the child. The Court addresses each argument in turn.

## I.   <u>Habitual Residence.</u>

In determining a child's habitual residence, a court must look to "the particular circumstances of each case." *Monasky*, 589 U.S. at 79. The inquiry is "fact-driven," focusing on whether "the child [was] at home in the particular country at issue." *Id.* at 79, 84. Among the factors relevant to the inquiry are the last moments of the parents' "shared intent or settled purpose" regarding the child's home and "the child's acclimatization to his or her current place of residence." *Mendez*, 778 F.3d at 344. "Where a child has moved with a parent from one country to another, the record must evidence the parties' latest settled intention for the child to abandon a former place of habitual residence and acquire a new one." *Id.* Tatosyan contends that E.T.'s habitual residence is Armenia because that is where E.T. was born and lived for the entirety of her life before she was removed to the United States. Galstian asserts that E.T.'s birthplace is not determinative of habitual residence because E.T. has resided with her as the child's sole, primary caregiver. Instead, Galstian

argues, the United States is E.T.'s habitual residence because E.T. is an American citizen and holds a valid passport.

Where, as here, the Court is considering a motion to dismiss, its role is not to determine E.T.'s habitual residence. Instead, its narrow task is to determine whether Tatosyan has plausibly alleged that Armenia is E.T.'s habitual residence. Accepting all his allegations in the verified complaint as true, as it must at this stage of the litigation, the Court concludes that Tatosyan has plausibly alleged that Armenia was E.T.'s habitual residence before her removal to the United States. E.T. was born in Armenia in February 2024 and, until her removal in February 2025, resided only in Armenia. ECF 1, ¶ 8. Before Galstian's move to the United States, both parents resided in Armenia. *Id.* ¶ 10. While Galstian argues that habitual residence is tied to the caregiving parent, "the wishes of one parent alone are not sufficient to change a child's habitual residence." *Mauvais v. Herisse*, 772 F.3d 6, 12 (1st Cir. 2014) (quotation marks omitted). Tatosyan has plausibly alleged that he did not intend for E.T. to acquire a new habitual residence in the United States when Galstian left the country in February 2025. Indeed, Tatosyan initiated proceedings in the Armenian Civil Court to establish a parenting schedule after the parties' separation. ECF 1, ¶¶ 15-16. Considering the allegations regarding the intent of the parents "at the latest time that their intent was shared," Armenia is plausibly the habitual residence for E.T. *Neergaard*, 752 F.3d at 531.

## II. Custody Rights.

The second element of a prima facie case requires Tatosyan to show that he had custody rights immediately before E.T.'s removal from Armenia. *Mendez*, 778 F.3d at 343. To determine whether a petitioner has custody rights, a court must look to the law of the place of habitual residence. *Whallon v. Lynn*, 230 F.3d 450, 456 (1st Cir. 2000). Although the parties dispute E.T.'s

7

habitual residence, they do not dispute that, for purposes of determining whether Tatosyan has custody rights, the Court should look to Armenian law.

The Convention defines custody rights to "include rights relating to the care of the child and the right to determine the child's place of residence." *Kufner v. Kufner*, 519 F.3d 33, 39 (1st Cir. 2008) (citing Hague Convention, art. 5). Such rights are distinguished from rights of access, which are defined as "'the right to take a child for a limited period of time to a place other than the child's habitual residence.'" *Id.* (quoting Hague Convention, art. 5). Rights of access are "far more limited" than rights of custody. *Whallon*, 230 F.3d at 455. Under the Convention, only parents with custody rights can petition for the return of a child to her habitual residence. *Id.* To assess whether Tatosyan possessed custody rights or rights of access before E.T.'s removal, the court must "look to the relevant provisions of [Armenian] law" and "interpret those provisions in light of the Convention's basic principle that a child's country of habitual residence is best placed to decide upon questions of custody and access, unless an exception applies." *Id.* at 456.

Galstian asserts that Tatosyan had no custody rights under Armenian law before E.T.'s removal and that, even if he did, she did not breach those rights by taking E.T. to the United States and keeping her in this country. Galstian points, in particular, to the Armenian court orders granting Tatosyan visitation rights, not custody rights, and allowing her to travel with E.T. to the United States without any prespecified date of return. Tatosyan responds that, under Armenian law, both parents of a minor child retain joint parental authority, including rights relating to the child's care and place of residence, unless and until modified by a court order. He argues that no Armenian court order has deprived him of the rights of custody he acquired when E.T. was born. And he claims that Galstian's removal of E.T. from Armenia without his permission, and retention of E.T. in the United States, have breached his custody rights.

At this early stage in the case, it is premature to decide whether Tatosyan had custody rights to E.T. when Galstian removed her from Armenia and, if so, whether those rights were breached. Even though the question whether he had custody rights is a question of law, *id.* at 454, both parties have submitted competing expert reports and interpretations of the scope of Tatosyan's rights under Armenian law, *see* ECF 34-1; ECF 35-1; ECF 36. In this Court's view, it is more appropriate, and more in line with the procedures under the Convention, to decide whether Tatosyan possessed custody rights to E.T., and whether those rights were breached, after an evidentiary hearing. *Cf. Felder v. Wetzel*, 696 F.3d 92, 97, 99 (1st Cir. 2012) (reversing district court's dismissal of a Hague Convention petition where the "court conducted oral argument on [the respondent's] motion to dismiss [the] petition under the Convention but did not take evidence," and concluded incorrectly that the petitioner lacked custody rights). At that hearing, both parties may seek to introduce expert testimony on the substance and procedure of Armenian law regarding parental rights.

For present purposes, it is enough to conclude that Tatosyan has made a plausible showing that he retained custody rights at the time of E.T.'s removal. Article 37 of the Armenian Constitution states that "[e]very child shall have the right to maintain regular personal relations and direct contacts with his or her parents, except for the cases where pursuant to a court decision it is against the interests of the child." Constitution of the Republic of Armenia July 5, 1995, art. 37. The Armenian Family Code further provides that "[p]arents have equal rights and obligations with regard to their children (parental rights)," and that "[p]arents have [the] right and are obliged to rear their children." Family Code of the Republic of Armenia, arts. 49, 51. Importantly, it then states that "[d]eprivation of parental rights is realized by judicial procedure," and it sets out various circumstances that may justify termination of a parent's rights. *Id.*, arts. 59, 60(1). The Family

9

Code also outlines processes for the "restriction of parental rights" through "established procedure." *Id.*, arts. 63, 64.

The decisions of the Armenian Civil Court and Court of Appeal do not indicate that Tatosyan had been deprived of his parental rights to E.T. through judicial procedure as of February 12, 2025. While the Civil Court on February 6, 2025 partially annulled the November 5, 2024 interim order and lifted the travel restriction, thus permitting Galstian to travel to the United States with E.T., it did not state that Tatosyan no longer had custody rights to E.T. under Armenian law. ECF 16-2, at 4-5. This case is unlike those in which parents lack custody rights under the Convention because a court of the country of habitual residence had previously awarded sole custody to the other parent. *See, e.g.*, *White v. White*, 718 F.3d 300, 304-05 (4th Cir. 2013) (father lacked custody rights where a Swiss court had explicitly awarded "the custody of the child" to the mother before removal, and a decision of the Swiss Supreme Court had made clear that "a parent who holds exclusive custody is entitled to move with the children, and even abroad, without having to obtain . . . the authorization of the other parent" (quotation marks omitted)).

In arguing that Tatosyan lacked custody rights to E.T., Galstian focuses on Articles 53 and 54 of the Armenian Family Code. Article 53 establishes procedures for determining the realization of parental rights and the child's place of residence "[i]n case of separate living of parents." Family Code of the Republic of Armenia, art. 53. Article 54 sets out procedures for effectuating the right of a parent "living separately from a child" to "communicate with the child, participate in his/her rearing, and solve the educational issues of the child." *Id.*, art. 54. These articles do not appear to displace a parent's right and obligation, established in Article 37 of the Armenian Constitution and Articles 49 and 51 of the Family Code, to rear their children. And Galstian does not meaningfully

address those provisions or other provisions of the Family Code that gave Tatosyan parental rights to E.T. as of her birth.

Galstian next argues that she complied with the Armenian court orders when she left the country and that no Armenian court has ordered her to return. Her argument raises a number of issues, including whether the court orders allowing Galstian to travel and giving Tatosyan limited visitation rights amounted to restrictions on Tatosyan's parental rights or converted his custody rights into mere rights of access, and whether her removal of E.T. from Armenia and retention of E.T. in the United States breached custody rights Tatosyan possesses. These are matters best left to development at the evidentiary hearing. At the motion to dismiss hearing, Galstian further highlighted Tatosyan's lack of involvement in E.T.'s upbringing during her first year of life in Armenia. Those facts are not drawn from the verified complaint and they, too, are subject to development at the evidentiary hearing. Tatosyan's conduct as a parent also bears more on whether he *exercised* parental rights (the third element of his prima facie case) than on whether he *had* rights of custody under Armenian law (the second element).

At this stage, the Court concludes that Tatosyan has plausibly alleged that he had custody rights under Armenian law that were breached by E.T.'s removal or retention.

### III.    Affirmative Defense.

Raising an affirmative defense, Galstian contends that returning E.T. to Armenia would pose a grave risk to the child. Once the petitioner establishes a prima facie case of wrongful removal or retention by a preponderance of the evidence, the Convention's "strong presumption in favor of returning [the] wrongfully removed or retained child" may be overcome only by "proving one of the Hague Convention's few, narrowly construed affirmative defenses." *Rodrigues*, 141 F.4th at 358. The grave risk defense requires Galstian to show, by clear and

11

convincing evidence, "'there is a grave risk that . . . return would expose the child to physical or psychological harm.'" *Danaipour v. McLarey*, 286 F.3d 1, 13 (1st Cir. 2002) (quoting Hague Convention, art. 13(b)); *see Charalambous v. Charalambous*, 627 F.3d 462, 467 (1st Cir. 2010) ("'grave' means a more than serious risk"). She "must prove subsidiary facts by a preponderance of the evidence," *da Silva*, 953 F.3d at 73, and the harm "must be something greater than would normally be expected on taking a child away from one parent and passing [the child] to another," *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) (quotation marks omitted).

To grant a motion to dismiss on the basis of an affirmative defense, "the facts establishing the defense [must be] clear from the face of the complaint as supplemented by matters fairly incorporated within it and matters susceptible to judicial notice." *Monsarrat v. Newman*, 28 F.4th 314, 318 (1st Cir. 2022) (quotation marks omitted). At this stage, Galstian fails to show by clear and convincing evidence, based on the facts in Tatosyan's complaint and appended documents, that there is grave risk in returning E.T. to Armenia. She asserts that returning E.T. would impose unreasonable hardship and give rise to medical and developmental risks. But these allegations are not derived from Tatosyan's pleadings, and this Court has not heard from witnesses about the veracity of Galstian's claims concerning safety and medical risk. *See Louis v. Charles*, No. 1:25-cv-10679-IT, 2026 WL 1162933, at *1, 8 (D. Mass. Apr. 29, 2026) (assessing the grave risk defense in light of testimony at an evidentiary hearing). Galstian's grave risk defense, and any other affirmative defenses she may wish to assert, are appropriate matters for the evidentiary hearing.

## CONCLUSION AND ORDER

For the foregoing reasons, Galstian's motion to dismiss, ECF 10, is DENIED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: August 10, 2026                          UNITED STATES DISTRICT JUDGE

13